UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | |
| JOHN AARON GASS : | Case No. 25-mj-279 |
| : | |
| Defendant. : | |
| : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its request that defendant John Aaron Gass be detained pending trial of this matter pursuant to 18 U.S.C. § 3142(f)(1)(A). Mr. Gass is charged with Production/Attempted Production of Child Pornography, in violation of 18 U.S.C. § 2251(a),(e), Coercion and Enticement, in violation of 18 U.S.C. § 2422, and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4). Mr. Gass used his position as a teacher at a local school to groom and entice a 16-year-old girl into engaging in sexual intercourse, keeping a secret "relationship" with her—while also dating an adult woman—for nearly nine months during which time he would travel from his home in Maryland into the District of Columbia to engage in sex acts. Further, Mr. Gass recorded at least two of these sex acts, on two different dates, on the victim's phone and sent them to himself.

The charged offenses are crimes of violence involving minors, and there is no condition or combination of conditions that will reasonably assure the safety of children in the community if Mr. Gass is released. As detailed below, an analysis of the factors set forth in 18 U.S.C. § 3142 leads to the conclusion that detention is the only way to protect children in the community and to ensure the defendant's future appearance.

3

## FACTUAL BACKGROUND

On or about November 21, 2025, the FBI received information from the Washington, D.C. Metropolitan Police Department (MPD) that John Aaron Gass, a former history teacher at District of Columbia International School (DCI) in Washington, D.C.,[1] met with a 16-year-old minor victim (MV1) on multiple occasions for the purposes of sex and, on at least two occasions, Mr. Gass used MV1's phone to film himself and MV1 having sex.

On November 19, 2025, a student reported to DCI school administrators that MV1 and Mr. Gass were in an inappropriate relationship. The student said that she was disclosing because MV1 and Mr. Gass had an argument, and Mr. Gass's girlfriend contacted MV1. This caused MV1 to become upset, and the student felt like they needed to say something. The school contacted MV1's mother before MV1, without giving the mother details, and out of concern, MV1's mother contacted the school to speak to MV1. When MV1 spoke to her mother, she realized that someone had disclosed her relationship with Mr. Gass. MV1 then disclosed to DCI administrators, and DCI contacted MPD.

Following MV1's disclosure to DCI school administrators, investigators with MPD interviewed MV1. ███████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

---

[1] DCI is a public charter school in Washington, D.C. for grades 6 to 12.

[2] Mr. Gass was a teacher ███████████ until November 2025. Mr. Gass had worked at the District of Columbia International School for approximately seven years. ███████████████████████████████
███████████████████████████████████████████████████████████████

4



. MV1 put the number in her phone and sent Mr. Gass a text message. MV1 believed they began text messaging each other on about March 28, 2025.

MV1 disclosed to MPD investigators that a few days after the initial text conversation, MV1 and Mr. Gass met on the bottom level of the parking garage at Children's Hospital in Washington, D.C.[5] MV1 entered the back seat of Mr. Gass's vehicle. Mr. Gass then got into the back seat of the vehicle. At one point during this meeting, the two engaged in oral and vaginal sex. MV1 reported they met in the parking garage because no one was there and there were no lights. MV1 told investigators that Mr. Gass drove a white Honda sedan with no bumper stickers.[6]

MV1 reported that after this, Mr. Gass began to send nude photographs of himself to MV1 and asked MV1 for nude images of herself. MV1 produced and sent the requested images to Mr. Gass.

MV1 reported that sometime in April, she received a call from Mr. Gass's girlfriend (W1). W1 was angry and yelled at MV1. When W1 called MV1, MV1 could tell that Mr. Gass's was with W1 and was telling W1 that MV1 was 21 or 22 years old. MV1 did not correct Mr. Gass.

---

[3] G Chat is understood by law enforcement to refer to Google Chat, a messaging tool by Google that can be used via web or mobile application.

[4] As identified through contact information in MV1's phone, the phone number Mr. Gass provided was 202-XXX-3724.

[5] In an interview with a school administrator, it was determined the Mr. Gass and MV1 met at Children's National Research and Innovation Campus, which is approximately 0.4 miles from MV1's school.

[6] Mr. Gass has a white Honda sedan registered to him.

MV1 reported that she and Mr. Gass met additional times at Children's to have sex in his vehicle. During the summer of 2025, approximately every week or every other week, Mr. Gass came to MV1's home in Washington, D.C., entered through MV1's bedroom window between approximately 1:00am-1:30am, and the two would have sex. Mr. Gass would typically leave at approximately 3:00am or 4:00am before MV1's mother woke and left for work at approximately 5:00am. MV1 reported that during 2025-2026 school year, she and Mr. Gass had sex more frequently. MV1 reported that they generally had protected sex, though they had unprotected sex on two occasions. Mr. Gass ejaculated inside MV1 on those occasions. Mr. Gass bought Plan B for MV1 and gave it to her. In early November 2025, Mr. Gass asked MV1 to be his girlfriend and told her he loved her.

MV1 also reported that Mr. Gass told her that she was mature for her age and that her body did not look like her age. He told her they could ignore their age difference. Mr. Gass also told her that other staff members also had relationships with students, and they did not have to worry about anything.

During MV1's initial disclosure to DCI school administrators, MV1 provided a school administrator with two videos of Mr. Gass and MV1 having sex. MV1 identified Mr. Gass as the man in the videos. MV1 reported that the last time the two had sex was approximately three weeks ago. A review of the timestamps of the videos provided by MV1 revealed the videos were taken on October 13, 2025, and November 9, 2025. MV1 later told MPD investigators that the videos were recorded on her phone by Mr. Gass then sent to Mr. Gass from her phone. FBI reviewed these videos and observed the following:

- Video title IMG_8489.MOV; Created November 9, 2025, at approximately 3:32 AM; Video is approximately 6 minutes and 31 seconds in duration.

(a) The video begins with an unknown individual positioning a recording device. Approximately 39 seconds into the video a television is turned on and a nude black female can then be seen laying on a bed. Approximately 1 minute and 52 seconds into the video, a black male matching the description of Mr. Gass can be seen picking up the recording device. Approximately 1:59 seconds into the video a female matching the description of MV1 can be seen with the male seen directly behind the female. The male then repositions the recording device and records the male inserting his penis into the female's genitals. At approximately 2:59 seconds the male picks up the recording device and focuses the camera on the male inserting his penis into the female's genitals. At multiple points in the video the recording device focuses on the male inserting his penis into the female's genitals.

- Video title IMG_7700.MOV; Created October 13, 2025, at approximately 3:01 AM; The video is approximately 3 minutes and 23 seconds in duration.

(a) The video begins with a black male inserting his penis into a black female's genitals. The male's body appears the same as the male depicted in Video title IMG_8489.MOV. The black male appears to be holding the recording device at this point in the video. At approximately one minute and 57 seconds the recording device focuses on the female's genitals. At approximately 2:29 seconds the camera is placed onto the bed and focuses on a black female's face, which matches the description of MV1.

Following a review of iMessage conversations between Mr. Gass and MV1, observed on MV1's phone, an iMessage conversation[7] between Mr. Gass and MV1 occurred at approximately 1:39 AM. At the beginning of the conversation, MV1 sends a message that reads, "Unfortunately I'm still up." MV1 later sends a message saying, "Goodnight." Mr. Gass later responds with the following messages: "On my way," "You window open?," "You sleep lol let's try tomorrow night then [2 kissing emojis]." The conversation occurred with a contact in MV1's phone as "G : ) )". The contact is saved under telephone number 202-XXX-3724.

Pursuant to a subpoena, T-Mobile provided subscriber information and Call Detail Records ("CDRs") for telephone number 202-XXX-3724. A review of the CDRs revealed communications between that number and a telephone number known to be used by MV1. The subscriber information provided by T-Mobile for the phone number included the following:

Customer Name: John Gass
Subscriber Name: John Gass
Billing Address: 3950 Garden City Drive, APT XXX, Hyattsville, Maryland 20785[8]

During her interview with MPD investigators, MV1 disclosed that on November 18, 2025, Mr. Gass and MV1 did a "screen share."[9] MV1 called Mr. Gass to inform him that other students at the school were saying that Mr. Gass was making them uncomfortable, and another student mentioned GASS offered her one-on-one tutoring. According to MV1, Mr. Gass became defensive and denied liking the other student. MV1 reported that Mr. Gass previously made comments about a senior's butt. During the "screen share," MV1 observed that Mr. Gass was still

---

[7] The conversation is listed as occurring on "Sunday," and the conversation was viewed by MPD the week of November 16th. Thus, this conversation likely took place on November 16, 2025.

[8] Open-source databases indicated this is a prior address used by Mr. Gass.

[9] A "screen share" is a feature when individuals are using FaceTime that allows one individual to share their screen with the other individual.

8

communicating with W1, though Mr. Gass previously told MV1 that they were no longer dating. Mr. Gass admitted that he was still talking to W1, and MV1 became upset. MV1 subsequently called W1 and told him that she was 16 years old and that she had been having sex with Mr. Gass.

MV1 told law enforcement that she deleted her text messages with Mr. Gass prior to Saturday, November 15, 2025. DCI captured a screen recording of the text chain with Mr. Gass. The text chain shows many messages between the 15th and 18th, including the messages referenced above where Mr. Gass asked MV1 whether her window was open. They also include Mr. Gass telling her that he loves her. Law enforcement also viewed MV1's call log, which showed multiple calls and FaceTime calls to and from Mr. Gass.



9

On Sunday, November 16, 2025, Mr. Gass also discussed meeting up with MV1 but later canceled:



Mr. Gass also sent MV1 multiple apologetic texts after the screenshare on November 18th:



## PROCEDURAL HISTORY

The defendant was arrested on December 11, 2025, and made his initial appearance that same day. On the government's motion, the defendant was held pending a detention hearing, which is scheduled for December 16, 2025. The government now respectfully submits this memorandum in support of its motion for pretrial detention.

**APPLICABLE LEGAL STANDARD**

The defendant is charged with Production/Attempted Production of Child Pornography, in violation of 18 U.S.C. § 2251(a),(e), Coercion and Enticement ("Coercion"), in violation of 18 U.S.C. § 2422, and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4), which are crimes of violence.  18 U.S.C. § 3156(c) defines a "crime of violence" to include violations of Title 110, under which § 2252(a)(2) falls.  Further, § 2252(a)(2) gives rise to a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(E), where it is to be *presumed* that no combination of conditions will protect the community or assure the defendant's return.  § 3142(e)(3)(E).  This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."  *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"); *see also United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008).  Even if the defendant does not pose a flight risk, danger to the community by itself is a sufficient reason to order pretrial detention.  *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. § 3142(g).  Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in

12

the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## ANALYSIS

For the reasons that follow, the government submits that the defendant cannot rebut the presumption in favor of detention, that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required or the safety of any other person and the community, and that the defendant should therefore remain detained pending trial.

### A. Nature and Circumstances of the Charged Offense

Mr. Gass has been charged with three child exploitation offenses by complaint. The severity of these offenses are reflected in their sentences: Sexual Exploitation and Attempted Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a),(e), carries a mandatory minimum sentence of 15 years' incarceration, Coercion and Enticement, in violation of 18 U.S.C. § 2422(b) carries a mandatory minimum sentence of 10 years' incarceration, and Possession of Child Pornography, in violation of § 2252(a)(4), (b)(2) carries a maximum sentence of 10 years' incarceration.

13

As Chief Judge Boasberg noted in considering the government's appeal of the magistrate court's release order in *United States v. Reid*, 25-cr-311 (JEB), it is important to consider where the defendant's behavior falls on the spectrum of conduct commonly seen in child exploitation cases. At one end of the spectrum are individuals who distribute a single image of child pornography. At the other end are defendants who are engaging in hands-on abuse of a child or running forums dedicated to trading child pornography.  Here, Mr. Gass's behavior clearly falls on the most serious end of this spectrum, as it involves both hands-on abuse, traveling into Washington, DC to commit that abuse, and production of child sexual abuse material.

Moreover, Mr. Gass's conduct is extremely concerning.  He sought out MV1 initially under the guise of tutoring her.  However, on their first tutoring session, Mr. Gass gave MV1 his personal phone number, and the two began engaging in sex acts shortly thereafter.  As a teacher, Mr. Gass was well-aware that MV1 was sixteen years old.  Mr. Gass abused his position as an authority figure for his own sexual gratification.  Once he had gained MV1's trust, Mr. Gass repeatedly met up with her to engage in sex acts.  Mr. Gass knew these encounters were inappropriate—the two first met in a secluded parking lot, away from prying eyes, and later, Mr. Gass would sneak into MV1's family home, unbeknownst to her parents.

Though not charged in the complaint, Mr. Gass's behavior also falls under 18 U.S.C. § 2423(b), as he traveled from Maryland into the District of Columbia on multiple occasions to engage in sex with a minor.  Further, each of these sex acts are also in violation of 22 D.C. § 3009.01, First Degree Sexual Abuse of a Minor.

Not only did Mr. Gass sexually abuse MV1, he escalated his conduct by recording his the abuse.  Mr. Gass recorded at least two sexual acts, on two separate occasions.  MV1 reported that Mr. Gass recorded the videos on her phone but sent them to himself—presumably, for his own

14

sexual gratification. Further, MV1 reported that Mr. Gass had sexual intercourse with her on at least two occasions without a condom or other birth control. At least one of these incidents resulted in Mr. Gass buying Plan B for MV1. The defendant's willingness to risk MV1's health and subject her to potentially permanent consequences – whether in the form of an STD or pregnancy – simply to satisfy his own sexual urges is certainly an aggravating factor with respect to both the nature and circumstances of this offense, as well as the danger he poses to all children in the community.

In these circumstances, there is no combination of conditions that will protect children both online and in the physical world from the danger posed by the defendant and the Court should detain Mr. Gass pending trial.

### B.  The Weight of the Evidence Against the Defendant

The weight of the evidence against the defendant is very strong and weighs in favor of detention. The government is in possession of the videos depicting Mr. Gass sexually abusing MV1. Further, the government is in possession of screen recordings and screenshots of the text chain between Mr. Gass and MV1, as shown above. MV1's call log also shows Mr. Gass repeatedly messaging and calling MV1 over the course of only a few days.

A district court must consider the weight of the evidence when assessing whether the defendant is a danger or poses a risk of flight and has broad discretion to determine the relative weight of each of the four Bail Reform Act factors. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *9 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) ("First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors."). No factor is categorically of greater or lesser weight than the others. As the Second Circuit Court of Appeals observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether

15

to release or detain a defendant. *See generally* 18 U.S.C. § 3142(g). That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2$^d$ Cir. 2022). In *Zhang*, the Second Circuit found that the district court gave appropriate weight to the second factor – the weight of the evidence – in determining that there was "significant evidence" that Zhang had in fact committed the charged murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness if released into the community, common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence, especially coupled with the nature of the charged offense. It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail.

*Id.* Similarly, in considering whether the defendant poses a risk of flight, the court explained that where "the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight. *Id.* at 151-52.

The *Zhang* court's analysis has been cited approvingly in the District Court of the District of Columbia in *Blackson*, and its analysis holds true here as well. *Blackson,* 2023 WL 1778194, at *9-10. The evidence against Mr. Urena is strong, suggesting both a heightened danger to the community as well as an elevated risk of flight. The strength of the evidence strongly supports detention, as it indicates the significant risk of danger posed by the defendant.

16

### C. History and Characteristics of the Defendant

The defendant has no criminal history; given the secretive nature of this offense, however, the defendant's lack of criminal history does not mean that he has not in fact engaged in other instances of similar criminal conduct. The defendant has shown, through his actions with both MV1 and his girlfriend, that he is capable of deception and of living a double life. He told MV1 that he had broken up with his girlfriend—that was not true. Likewise, he told the girlfriend that nothing was going on with MV1—that was also not true.

This Court should also consider the defendant's position in the community and his abuse of that position. The defendant has been a teacher in the DC area for many years and has worked at DCI for seven years. He used his position as a teacher and trusted adult to get close to MV1 under the guise of tutoring. Further, MV1 reported that other students indicated that the defendant made them uncomfortable, and that the defendant had previously commented sexually on another student. Although it is unclear what the precise nature of the other students' complaints were, this is a concerning fact.

Thus, the defendant's history and characteristics weigh in favor of detention.

### D. The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the sexual exploitation of children presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like the defendant and others with a demonstrated sexual interest in children. It is this type of harm that led Congress to create the statutory presumption of detention in these cases.

That child pornography offenses are serious is a fact noted by the Supreme Court. At least as early as the landmark decision, *New York v. Ferber*, 458 U.S. 747 (1982), the Supreme Court

17

referenced numerous research materials detailing the harm to children as a result of the production and trafficking of child pornography.

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."

Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981). *See also* Child Exploitation 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U.Mich.J. Law Reform 295, 301(1979)(interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). 4 58 U.S. 758, n.9.

> Moreover, as the Eastern District of New York has found:
>
> ...the issue is not only defendant's potential abuse of children and his interaction with children if on bail, but also his ability, if he is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.

*United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006). The *Reiner* court further found that there were no conditions in that case that could reasonably assure the safety of the community "[i]n this day and age, with devices such as cellphones, Blackberries, and laptops..." *Id.* at 399; *see also United States v. Blankenship*, 2008 WL 1925137 (S.D.W.Va. April 29, 2008) (unpublished) (noting the ease of accessing the internet by means of various devices and stating "[t]he Court finds that the evidence clearly and convincingly establishes that, confined to his home

18

and electronically monitored, defendant would not be prevented from obtaining the means to access the internet and attempting again to obtain child pornography and in this poses a danger to children and the community"); *United States v. Doyle,* 2007 WL 1097844, *1 (W.D.Va. 2007)(finding danger of future offenses "especially considering that pornographic images of children are widely available on the internet and can be easily accessed by a personal computer"), conviction rev'd on other grounds, 650 F.3d 460 (2011).

The defendant's conduct was not a one-time occurrence, nor a lapse of judgment: he engaged in a repeated pattern of behavior where he sexually abused MV1 and created child sexual abuse material of that abuse for his own sexual gratification on multiple instances. This abuse went on for nearly nine months, which shows the predatory and persistent nature of his conduct. Thus, this factor weighs strongly in favor of detention as well.

## CONCLUSION

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the defendant should be detained pending trial.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By: */s/ Rachel Bohlen*
Rachel Bohlen
DC Bar No. 1010981
Assistant United States Attorney
601 D St NW
Washington, DC 20530
(202) 809-3575
rachel.bohlen@usdoj.gov